# EXHIBIT A

```
 1   UNITED STATES DISTRICT COURT

 2   SOUTHERN DISTRICT OF NEW YORK
     -----------------------------------X
 3   ROBERT BARBERA,

 4            Plaintiff,

 5                          Case No.:
                            24-cv-3535(LJL)
 6       -against-

 7   GRAILED, LLC,

 8            Defendant.
     -----------------------------------X
 9

10

11   DEPOSITION OF

12            ROBERT BARBERA

13

14            TUESDAY, March 28th, 2025

15

16            New York, New York

17

18

19

20

21

22   Reported By:

23   Marina Dubson

24   Job number:  J12631819

25
```



1

2

3

4                    DATE: March 28, 2025

5                    TIME: 9:48 a.m.

6

7

8           DEPOSITION of ROBERT BARBERA, the

9    Plaintiff herein, taken by the Defendant,

10   pursuant to Federal Rules of Civil

11   Procedure, and Notice, held at Mitchell

12   Silberberg & Knupp LLP, 437 Madison Avenue,

13   25th Floor, New York, New York 10022, at

14   the above-mentioned date and time, before

15   MARINA DUBSON, a Notary Public of the State

16   of New York.

17

18

19

20

21

22

23

24

25



1    APPEARANCES:

2

3

4    SANDERS LAW GROUP
     Attorney for Plaintiff
5    ROBERT BARBERA
     333 Earle Ovington BLVD suite 402
6    Uniondale NY 11553,
     BY: JONATHAN CADER, ESQ.
7         Jcader@sanderslaw.group

8

9

10   MITCHELL SILBERBERG & KNUPP LLP
     Attorney for Defendant
     GRAILED, LLC
11   437 Madison Avenue, 25th Floor,
     New York, New York 10022
12   (917) 546-7683
     BY:   ANDREW NIETES, ESQ.
13         Afn@msk.com

14

15

16   ALSO PRESENT:

17   Maya Peretz, Videographer
     Shereck Video
18   Mayap@its202.com

19

20

21

22

23

24

25



```
 1                    R. Barbera
 2   more than 30 lawsuits in the last 5 years?
 3         A.    Yes.
 4         Q.    Would you say you have filed
 5   more than 40 lawsuits in the last 5 years?
 6         A.    Yes.
 7         Q.    Would you say that you have
 8   filed more than 50 lawsuits in the last 5
 9   years?
10         A.    Yes.
11         Q.    Would you say that you have
12   filed more than 60 lawsuits in the last 5
13   years?
14         A.    Yes.
15         Q.    Would you say you have filed
16   more than 70 lawsuits in the last 5 years?
17         A.    Yes.
18         Q.    So, would you say that you have
19   filed around 100 lawsuits in the last 5
20   years?
21         A.    No.
22         Q.    So, you filed between 70 and
23   100 lawsuits in the last 5 years?
24         A.    Yes.
25         Q.    See, we can get there.
```



```
 1                    R. Barbera
 2        Q.    You would do your searching at
 3   times you would be with your family?
 4        A.    I would do it all times of the
 5   day.
 6        Q.    Is there any time when you
 7   would not want to be doing searching?
 8        A.    Yes.
 9        Q.    Which times?
10        A.    Times when I didn't want --
11   times when I wasn't feeling it.  We're all
12   human, we all have times we don't feel like
13   doing work.
14        Q.    What would be some of those
15   times?
16        A.    Tired, lazy times, busy time,
17   hungry times.  I mean, again, it's just
18   regular human nature of -- I am
19   self-employed so it's whatever I put into
20   it.  In any of my businesses, it's whatever
21   I put into them.  So, if I put five minutes
22   of work, I am going to get paid five
23   minutes of time.  If I spend a lot of time
24   on my work, I can earn more money.
25        Q.    So, lazy times, would that be
```



```
 1                        R. Barbera
 2    after a long shoot day?
 3         A.    Yes.
 4         Q.    Would that be on vacation?
 5         A.    Yes.
 6         Q.    Okay.
 7         A.    For sure.
 8               MR. NIETES:  I am handing the
 9          court reporter what will be Exhibit
10          C.
11               (Defendant's Exhibit C, e-mail,
12          was marked for identification as of
13          this date by the Reporter.)
14    BY MR. NIETES:
15         Q.    Do you recognize this document?
16         A.    Yes.
17         Q.    What is this?
18         A.    This is an e-mail from a
19    research analyst.
20         Q.    Who is the research analyst?
21         A.    Lauren Reyna.
22         Q.    Who is Lauren Reyna?
23         A.    She's a research analyst.
24         Q.    Is she affiliated with Sanders
25    Law Group?
```



```
 1                      R. Barbera
 2        Q.    Does that include the Liebowitz
 3   Law Firm?
 4        A.    Yes.
 5        Q.    Would it have been the same
 6   process to receive these e-mails in 2019?
 7             MR. CADER:  I'll object to the
 8        form.
 9             THE WITNESS:  If you mean an
10        e-mail coming to my inbox, yes.
11   BY MR. NIETES:
12        Q.    Would it be similar to receive
13   a weekly reminder to upload your images
14   from Liebowitz Law Firm in 2019?
15        A.    Again, if you mean an e-mail
16   coming into my inbox to remind me, then
17   yes.
18        Q.    Do you understand that this
19   e-mail is a reminder to upload your images
20   so that the law firm may register images
21   with the U.S. Copyright Office on your
22   behalf?
23        A.    Yes.
24        Q.    At present, does Sanders Law
25   Group handle registering all your
```



```
 1                   R. Barbera
 2   photographs with U.S. Copyright Office?
 3        A.    All of the images I send to
 4   them, yes.
 5        Q.    Are there any other images
 6   you're responsible for registering them
 7   with the U.S. Copyright Office?
 8        A.    No.
 9        Q.    Have you ever registered a
10   photograph with the U.S. Copyright Office
11   on your own?
12        A.    No.
13        Q.    Was the process for
14   registration the same at the Liebowitz Law
15   Firm?
16        A.    Yes.
17        Q.    So, your law firm would submit
18   an application to register to the U.S.
19   Copyright Office on your behalf; is that
20   right?
21             MR. CADER:  Objection.
22             THE WITNESS:  I'm not sure
23        about their process.  I'm not
24        involved in that.
25             (Clarified by the Court
```



```
 1                       R. Barbera
 2        A.    Yes.
 3        Q.    And do you see copyright
 4   claimant, Robert Barbera?
 5        A.    Yes, I do.
 6        Q.    Are you still at the address
 7   listed at Barbera 33?
 8        A.    I am not.
 9        Q.    And that is a New York,
10   New York, address, correct?
11        A.    Yes.
12        Q.    Do you see under certification,
13   it says name, Richard Liebowitz?
14        A.    Yes.
15        Q.    Who is Richard Liebowitz?
16        A.    A lawyer.
17        Q.    Did Richard Liebowitz perform
18   law services on your behalf?
19        A.    He did.
20        Q.    Did that include applying for
21   the registration in Exhibit H?
22             MR. CADER:  I'll object to the
23        form.
24             THE WITNESS:  That's what this
25        document says.
```



```
 1                    R. Barbera
 2              Yeah, it's -- this is the
 3    complaint itself and then this is what I am
 4    agreeing to and signing at the bottom, I
 5    believe, right?
 6         Q.   So, let's go back to Exhibit F.
 7         A.   No, that's not the one I signed
 8    because it's not signed by me.  So no, I
 9    don't know what this document is then.
10         Q.   You don't know what Exhibit K
11    is?
12         A.   No.
13         Q.   You haven't seen Exhibit K
14    before today?
15         A.   I don't remember seeing a
16    demand for jury trial.
17         Q.   Looking at the upper left-hand
18    corner, do you see that this says Robert
19    Barbera, Plaintiff?
20         A.   Yes.
21         Q.   And that's you, correct?
22         A.   Yes.
23         Q.   And do you see that it says
24    Grailed LLC, Defendant?
25         A.   Yes.
```



```
 1                   R. Barbera
 2       Q.    So, the URL listed in 22 is the
 3   URL that you discovered the photograph at?
 4       A.    Yeah.  That's the online hosted
 5   one where anyone can see it at.
 6       Q.    You have no understanding of
 7   what the URL in 23 is?
 8       A.    23 might be a -- probably a
 9   right click and save of image.  And how
10   it's saved, I don't know.  That's probably
11   what it is, given it shows the height and
12   width.
13       Q.    Did you complete that process
14   personally?
15       A.    I wouldn't know if it's from
16   this number, what these numbers are.  I
17   don't know that.
18       Q.    Do you have any understanding
19   of how your attorneys found this URL in
20   paragraph 23?
21             MR. CADER:  Objection.
22       A.    I don't because I don't know
23   what that URL is.  Again, it could be a
24   screen grab of that picture.
25       Q.    Your attorneys never explained
```



```
 1                    R. Barbera
 2         legal advice?  Attorney-client
 3         privilege only applies to legal
 4         advice.
 5              MR. CADER:  I don't know what
 6         happened in that conversation, but I
 7         think you can ask the question.
 8    BY MR. NIETES:
 9         Q.    Has anyone ever explained to
10    you how this URL was found?
11         A.    I don't know.
12              MR. NIETES: Jonathan, I'd like
13         to note for the record that your
14         client waived privilege by failing to
15         appear for this.  So, while I am
16         entertaining the objections, we don't
17         have to.
18    BY MR. NIETES:
19         Q.    So, you don't have any evidence
20    supporting that -- that the photograph was
21    stored locally on defendant's server at the
22    URL in paragraph 23?
23         A.    I don't know.
24              (Clarified by the Court
25         Reporter.)
```



1                      R. Barbera

2        A.    Yeah, that's totally fine.

3        Q.    To be clear, you discovered

4   this photograph and your law firm did not

5   discover the photograph on Grailed's

6   website?

7        A.    Yes.

8        Q.    I want to go back to Exhibit B,

9   please.  It's bearing Bates number 2056.

10       A.    Which page is that one?

11       Q.    The Bates bearing 56.  It was

12  Exhibit B.

13       A.    You said Exhibit B as in boy?

14       Q.    B as in boy, right.

15            MR. CADER:  You said 2056?

16            MR. NIETES:  Yeah, that's the

17       starting Bates.

18            THE WITNESS:  I no longer see

19       that one here.  I see C here, but not

20       B.  I don't see the B anymore.

21  BY MR. NIETES:

22       Q.    Do you have Exhibit B in front

23  of you?

24       A.    I do.

25       Q.    I want to turn you to page 2061



```
 1                    R. Barbera
 2   in Exhibit B.
 3        A.    You've got to give me a second
 4   here.  Okay.  I got it.
 5        Q.    Do you recall earlier we were
 6   discussing this e-mail of April 5, 2022?
 7        A.    I do.
 8        Q.    And do you recall that you did
 9   not respond to this e-mail until April 13,
10   2022?
11        A.    Okay.  Yes.
12        Q.    And do you recall that you had
13   said you were on vacation during this time
14   period?
15        A.    Yes.
16        Q.    Were you scrolling Grailed's
17   website on vacation?
18        A.    I could have been.
19        Q.    Do you recall if you were
20   scrolling Grailed's website on vacation?
21        A.    I don't, off the top of my
22   head.
23        Q.    You can put that aside.  Thank
24   you.
25              So, after you discovered this
```



```
 1                      R. Barbera
 2    up with my wording for this and my answers
 3    for this on my own.  I didn't just remember
 4    this off the top of my head.  I had put it
 5    down first and then we had worked through
 6    it.  So, that's how it came to fruition.
 7              So, once this was already
 8    submitted, I signed this, it's already sent
 9    out.  I don't keep those documents anymore.
10         Q.   So, Robert, I am just asking:
11    You said you used your notes app to help
12    you draft this, right?
13         A.   Yes.
14         Q.   You don't have that notes app
15    anymore?
16         A.   No.  I don't keep the notes.  I
17    don't keep e-mails either.  Maybe I'm OCD,
18    I don't keep text messages either.
19         Q.   Okay.  Has that been your
20    practice since -- how long has that been
21    your practice?
22         A.   My whole life.  I've always
23    deleted all this stuff.  I always purge my
24    inbox, my e-mails, my text messages.  I
25    always delete everything.  It's just how I
```



```
 1                    R. Barbera
 2   am.
 3        Q.    Is that the same in 2022?
 4        A.    That's been the same in my
 5   entire life, generally.
 6        Q.    Would that be the same if you
 7   filed a lawsuit?
 8        A.    Yes, for within -- as long as
 9   it's within the year.  I generally keep
10   like the lawsuit stuff for like at least a
11   year, just in case I ever have to reference
12   something.
13        Q.    So, why didn't you keep this?
14        A.    Because it's just notes that
15   are right here in my hand now.
16        Q.    You didn't think it was
17   important to keep those notes?
18        A.    Not at all.
19        Q.    Have you ever been told that it
20   was important to keep those notes?
21        A.    No.
22        Q.    Have you ever been told it was
23   important to not delete your e-mails after
24   a year?
25        A.    I don't think anybody's ever
```



```
 1                    R. Barbera
 2   told me that.
 3        Q.    Have you ever been told in
 4   connection with your lawsuits, you're
 5   required to preserve all relevant
 6   documents?
 7        A.    For up to a certain period of
 8   time.
 9        Q.    What is that period of time?
10        A.    One year.
11        Q.    After you file a lawsuit, you
12   only keep the documents one year?
13        A.    Including all these approved,
14   disapproved, the uploaded notifications.
15   All of that, I purge all of that.
16        Q.    Including if the lawsuit is
17   pending?
18        A.    If it's -- I mean, they're
19   never -- what do you mean by pending?
20        Q.    There hasn't been a settlement
21   agreement entered.
22        A.    You mean by -- so for this,
23   you're talking about for this case right
24   now?
25        Q.    I'm speaking generally.  If a
```



```
1                        R. Barbera
2         Q.    Including if you were going to
3    send a demand letter, would you keep those
4    photos?
5         A.    Can you clarify that?
6         Q.    Sometimes your law firm will
7    send a letter to somebody who is using your
8    photo without authorization, right?
9         A.    Yes.
10        Q.    If they sent that letter, would
11   you still keep the records related to that
12   photo?
13        A.    If it was for a certain period
14   of time if they sent me that document, then
15   yeah, I would.  For a certain period of
16   time until I deem it of no longer use and
17   that's usually after a year.
18        Q.    Usually after a year?
19        A.    Yes.
20        Q.    It has nothing to do with
21   whether or not you filed a federal claim?
22        A.    No.  Why would that bear any
23   relevance?
24        Q.    Are there any documents related
25   to this claim that you have deleted?
```



```
1                        R. Barbera
2         A.    No, the only documents that are
3    related to this claim I have already sent
4    over.
5         Q.    Except for your drafting --
6         A.    That's not a document.
7         Q.    Are there any notes that you
8    have deleted in relation to this claim?
9         A.    Any notes that I wrote down
10   while I was on a phone call are not
11   relevant to this.  Those are things I jot,
12   and I deleted that right after that.
13   That's not a document pertaining to this.
14        Q.    I understand that you don't
15   think it's relevant.  I am asking whether
16   or not you deleted it.  Is the answer yes?
17        A.    Yes.  They're all deleted.
18        Q.    I just wanted to clarify.
19        A.    I think I should clarify what I
20   say when I mean jotting something down.
21   It's not anything finalized.  It's my
22   thoughts.  It's me typing out random stuff.
23   It's me adding things that have nothing to
24   do with this.  It's me writing things down
25   that he's saying or somebody is telling
```



1                    R. Barbera

2        A.    What would be the purpose of

3   them telling me there's no claim?  Example?

4        Q.    Let's say that they found a

5   license for it, hypothetically.

6        A.    Yeah, I would delete it.  Of

7   course, yeah.  There's no reason for me to

8   save it on there.

9        Q.    Let's say you sent something

10  you think is an infringement to your

11  attorney and it was three years ago.  For

12  some reason, there's been no action taken

13  yet.  Would you delete e-mails relevant to

14  that?

15       A.    It may get caught up in my

16  delete, but once you -- just like how I was

17  able to provide some of those e-mails,

18  those were pulled out of my trash, too.

19  So, there are some times when I am able to

20  pull it back.

21            Just to clarify here, I am not

22  talking about deleting original files or

23  original images.  I am talking about

24  deleting the screenshot that I sent to my

25  lawyer because they have already saved it



```
 1                      R. Barbera
 2    on their files.  That's what I'm talking
 3    about deleting.  Not relevant things to
 4    ongoing cases, not important stuff like
 5    that.
 6              We're talking about like a
 7    screen grab or something that I now know
 8    that he has on his phone.  I have it on my
 9    phone.  There's no reason for it to sit in
10    my inbox.
11         Q.    So, you would delete that
12    e-mail?
13         A.    Yes.
14         Q.    Let's say you found an
15    infringement and you sent it to your lawyer
16    and you -- for some reason, your lawyer
17    doesn't respond, just missed in their
18    inbox.  Would you have turned off your
19    auto-delete for that particular e-mail?
20         A.    I would have messaged them
21    again.
22         Q.    But you wouldn't have turned
23    off your auto-delete after sending it to
24    them?
25         A.    It's not an auto-delete.  I
```



```
 1                    R. Barbera
 2   something.  If it was important, if there's
 3   something to jot down.
 4        Q.    If you jotted it down
 5   afterwards, generally, you would delete it?
 6        A.    Especially if it's not
 7   relevant.  Yes, of course.  If it's
 8   something I need for, you know, what's the
 9   next phone conversation or something like
10   that, I'll keep it, of course.  If it's
11   something that's not, then it just goes.
12        Q.    And that's true in this case,
13   too?
14        A.    That's true in every case.
15        Q.    Has your lawyer ever told you
16   you should not be deleting those things?
17        A.    I don't think so.  I don't
18   know.  I think I would have remembered if
19   they told me to keep certain things.
20        Q.    You can put that to the side,
21   but we may come back to Exhibit O, I think
22   we're at.  Yes.
23             MR. NIETES:  I'm handing the
24        court reporter what will be Exhibit
25        P.
```



```
 1                      R. Barbera
 2    subscription-based sale.
 3          Q.    Can you explain that to me?
 4          A.    Well, it's two different sale
 5    IDs, the same set and the same price.  That
 6    typically happens when it's
 7    subscription-based.  So again, meaning that
 8    a small company, or in this case $35,
 9    probably a mid-level blog or something like
10    that, licensed pictures on two different
11    sale IDs.  It's probably a subscription.
12    This is probably a subscription-based
13    payment.
14          Q.    Do you have any records showing
15    which publication would have purchased this
16    image?
17          A.    Not on this document, but I am
18    sure BackGrid knows.
19          Q.    Do you personally have any
20    documents that would reflect this?
21          A.    I think on my dashboard it will
22    show me who bought the photos for the sets.
23    I believe I provided that as well.  It was
24    a screen grab.
25                MR. NIETES:  Counsel, I don't
```



```
 1                      R. Barbera
 2          recall seeing that.  To the extent
 3          you have it, we're going to ask for
 4          production of it.
 5              (Request noted.)
 6              THE WITNESS:  Where's that one
 7          we just had before with the set
 8          information?
 9              MR. CADER:  Call for production
10          of what?
11              MR. NIETES:  The document which
12          shows which entity made the sale in
13          each of these sale IDs.
14              THE WITNESS:  Oh, it's not on
15          here?  It's not on here.  I actually
16          thought it was on this first Exhibit
17          L.  Yeah, it's not on Exhibit L
18          actually.
19    BY MR. NIETES:
20          Q.   But it exists, correct?
21          A.   I'm sure BackGrid has that
22    information.
23          Q.   Do you have that information?
24          A.   I don't have that information.
25              MR. CADER:  Just one moment,
```



```
1                         R. Barbera
2               THE WITNESS:  Not only do I not
3          work at BackGrid so I wouldn't be
4          able to provide you with the
5          reasoning behind that, we can already
6          see here that the sales pertaining to
7          the set contain values.  So, this is
8          obviously some type of error.
9    BY MR. NIETES:
10        Q.    Do you have any records
11   reflecting the amount you were paid?
12        A.    I already submitted those
13   documents.  Exhibit -- I'm sorry, I don't
14   know what exhibit that was, but --
15        Q.    Are you referring to exhibit --
16        A.    P.
17        Q.    Exhibit P is a sales amount,
18   correct?
19        A.    Yes.
20        Q.    How much of that sales amount
21   were you paid?
22        A.    70 percent.
23        Q.    Do you have records reflecting
24   70 percent paid to you?
25        A.    I'm sure it exists.  I don't
```



```
 1                      R. Barbera
 2    have that record, but I'm sure it's there
 3    somewhere.
 4         Q.    Would your bank account
 5    reflect --
 6         A.    Sure.  That can work.
 7              MR. NIETES:  Counsel, we're
 8         going to call for production of those
 9         bank records to the extent they
10         exist.
11              (Request noted.)
12              THE WITNESS:  I want to
13         clarify, before you make him do that,
14         that the bank record will show one
15         payment from BackGrid for a total
16         sum.  It won't show that there's
17         individualized sales.
18    BY MR. NIETES:
19         Q.    So, you don't have any record
20    reflecting the individual amount paid to
21    you for these sales?
22         A.    Well, the individual amount
23    will come up as a sales report.  So, if I
24    request a sales report, it will tell me the
25    exact nature of every sale, where it went.
```



```
1                      R. Barbera
2    But I have to request the sales report
3    regarding this set of images.
4         Q.    Did you request a sales report
5    for the set of images previously?
6         A.    I did not think I would need to
7    provide my commission base here that says
8    zero.  I'm not sure why it's saying that.
9         Q.    Did you request a sales report
10   for these images previously?
11        A.    I didn't.  No, I did not.
12        Q.    What is the process for
13   requesting such sales report?
14        A.    I'm not sure.
15        Q.    Could you figure out how to
16   request a sales report?
17        A.    I'm not sure.
18        Q.    Could you contact someone at
19   BackGrid and ask them for a sales report?
20        A.    I'm not sure, but I could ask.
21        Q.    Did you ask, before today,
22   anyone at BackGrid whether they could
23   provide you a sales report?
24        A.    I don't think so.  This is a
25   sales report, technically.  This is the
```



                        R. Barbera

1
2          A.      What are the other ones?   We
3     haven't gone over those ones yet.
4          Q.      This entire set.   From the
5     entire document of Exhibit Y, do you
6     understand that the court ordered you to
7     provide responses to this set of
8     interrogatories in March of this year?
9          A.      Yes.   But which one is it that
10    you have question with?
11         Q.      I am not asking you about a
12    specific one.   I am asking whether you
13    understand the court ordered you to
14    provide --
15         A.      Yes, of course.
16         Q.      Do you understand that was in
17    connection with a motion for sanctions?
18         A.      Yes.
19         Q.      You understand this information
20    was provided within the last few weeks?
21         A.      Yes.
22         Q.      And you, sitting here now,
23    cannot tell me what the name of the checker
24    is that you used to determine the
25    10-million number?



ROBERT BARBERA                                    March 28, 2025
BARBERA vs GRAILED                                            300

```
 1                      R. Barbera
 2        A.    No.  It's Google-something.  I
 3   forget the name of it.  It's called Google
 4   Check.  It's literally something like that.
 5   I just don't remember the name of it.
 6   There's like a hundred of them.
 7        Q.    I'm just asking --
 8        A.    Yeah, I understand.
 9        Q.    I'm just asking that you don't
10   know, sitting here today, which one you
11   used?
12        A.    That's why it's worded as the
13   views were through the Google search,
14   because it's hosted by Google, that app.
15   Or that page, rather.
16        Q.    Do you see the next sentence in
17   the supplemental response under
18   Interrogatory Number 15 states, The basis
19   for Plaintiff's belief that defendant
20   received a financial benefit directly
21   attributable to his photograph is the
22   belief that the revenues Defendant derived
23   from its website are based at least in part
24   on the number of page views it receives?
25        A.    Yes.
```



```
 1                       R. Barbera
 2        Q.    What is your basis for that
 3   belief?
 4        A.    When a website receives
 5   traffic, it receives views.  When websites
 6   receive views, they receive financial gain
 7   in any capacity, whether that's from views,
 8   whether that's from new users, whether
 9   that's more people coming onto Grailed to
10   sell more items that Grailed takes a fee
11   of.
12             It seems pretty
13   self-explanatory.  They're getting a lot
14   more views.  My image is hosted there.
15   People are viewing my image and that's
16   bringing traffic to that or to the page or
17   either.
18        Q.    So, your belief is based on
19   your personal experience?
20        A.    My belief is based on the
21   experience of the internet.  That's how
22   internet works.
23        Q.    What sources do you have that
24   states that's how the internet works?
25        A.    I can provide any sources that
```



```
1                      R. Barbera
2    would be necessary, if you requested those,
3    to how sales traffic generates sales on the
4    internet.  Yes, I can do that.
5         Q.    Did you consult those when
6    drafting this interrogatory response?
7         A.    Did I consult which ones?
8         Q.    The sources you just referred
9    me to.
10        A.    Which ones are those?
11        Q.    You stated that you could
12   provide me with sources that state this is
13   how the internet works.
14        A.    Yes.
15        Q.    Did you review those sources in
16   preparing your interrogatory responses?
17        A.    Did I search how website
18   traffic generates income?
19        Q.    Yes.
20        A.    Yes, I did.
21        Q.    What pages did you review?
22        A.    I would have to get you those.
23             MR. NIETES:  Jonathan, we're
24        going to need those produced.
25             (Request noted.)
```



```
 1                    R. Barbera
 2   now.
 3        Q.    What documents from BackGrid
 4   did you send to your counsel in the last
 5   few weeks?
 6        A.    Which documents from BackGrid?
 7   Whatever ones I had sent to them.  The ones
 8   that you guys have.  The ones you're
 9   providing me from BackGrid.  Those were all
10   gathered up during the course of the last
11   couple months.
12        Q.    Did you search for those in
13   March of 2025?
14        A.    I believe it was before that.
15   March 2025, we were already here.  We were
16   already established with all this.
17        Q.    So, when you had searched for
18   the BackGrid documents, it wasn't
19   March 2025?
20        A.    No.  We already submitted those
21   long before that.
22        Q.    So, the incident that crashing
23   occurred wasn't in March 2025?
24        A.    It was before the last few
25   weeks, but within the last few months that
```



```
 1                         R. Barbera

 2         A.    It's my view that what I

 3   provided should be seen as more than

 4   adequate.  I provided an insane amount of

 5   documents for this.  That is my view,

 6   actually, if you need to know that.

 7         Q.    It's your view that those sales

 8   reports reflecting the individual income

 9   would not be responsive to this request?

10         A.    It's my view those sales

11   reports reflect my income, so they would be

12   responsive to this request.

13         Q.    Okay.

14              MR. NIETES:  Well, then we're

15         going to need those individual sales

16         reports.

17              (Request noted.)

18              MR. CADER:  Individual sales

19         reports?

20              MR. NIETES:  The ones

21         reflecting the total amount actually

22         paid to you.

23              THE WITNESS:  Yeah.  I can get

24         BackGrid to send the undoctored zero

25         balance one regarding the sales of
```



ROBERT BARBERA                                    March 28, 2025
BARBERA vs GRAILED                                           311

1                      R. Barbera

2          that thing.  Because they sent it to

3          you, they should have no problem

4          getting me that.  I'll make sure to

5          ask them why it says zero because

6          that's crazy.  Feel free to also

7          reach out to them and say that I said

8          this is not accurate.

9    BY MR. NIETES:

10         Q.    Turning to page 25 of this

11   document.

12         A.    Is this separate or no?

13         Q.    Do you see page 25?

14         A.    Yes.

15         Q.    Do you see Request for

16   Production Number 61?

17         A.    61, yes.

18         Q.    Do you see request, Documents

19   concerning your investigation of your

20   claims in this action?

21         A.    Yes.

22         Q.    And do you see the supplemental

23   response that Plaintiff does not have any

24   documents responsive to this request other

25   than those already produced or those to be



ROBERT BARBERA                                    March 28, 2025
BARBERA vs GRAILED                                            312

```
1                       R. Barbera
2   produced?
3        A.   Yes.
4        Q.   I just want to confirm as of
5   today, March 28th, that you do not have any
6   further documents responsive to this
7   request other than those already produced.
8        A.   No.  I do not have any other
9   documents that I haven't submitted already.
10  Those documents that you're requesting will
11  be coming from BackGrid, not from me.
12       Q.   Regarding your investigation of
13  these claims?
14       A.   Regarding the individualized,
15  what that amended version of what they sent
16  you which they didn't send to me.
17       Q.   I am asking you about Request
18  Number 61, which are documents concerning
19  your investigation of your claims in this
20  action.
21       A.   No.  Sorry.
22       Q.   So, you have no other e-mails
23  regarding your investigation of the claim?
24       A.   No.
25       Q.   You have no other text messages
```



```
 1                    R. Barbera
 2    regarding the investigation of the claim?
 3         A.    No, because everything was
 4    handled on the phone call or the e-mail.
 5         Q.    Including approval of filing of
 6    the lawsuit?
 7         A.    Including -- what do you mean
 8    by approve?  That approve and disapprove
 9    sheet we talked about before?
10         Q.    Yes.
11         A.    That came on e-mail, yes.  Of
12    course.
13              MR. NIETES:  Jonathan, we don't
14         have that e-mail.  We're going to
15         need it produced.
16              (Request noted.)
17              MR. CADER:  I'll have to look
18         at the production.  If it's there, it
19         would be there.
20              MR. NIETES:  This was in my
21         letter of March 23rd showing we
22         didn't have that, and you didn't
23         provide it.
24              THE WITNESS:  It could have
25         been it was on the phone and then you
```



ROBERT BARBERA                                    March 28, 2025
BARBERA vs GRAILED                                          341

```
 1                      R. Barbera

 2                 C E R T I F I C A T E

 3

 4   STATE OF NEW YORK        )
                              :
 5   COUNTY OF RICHMOND       )

 6

 7        I, MARINA DUBSON, a Notary Public for

 8   and within the State of New York, do hereby

 9   certify:

10        That the witness whose examination is

11   hereinbefore set forth was duly sworn and

12   that such examination is a true record of

13   the testimony given by that witness.

14        I further certify that I am not

15   related to any of the parties to this

16   action by blood or by marriage and that I

17   am in no way interested in the outcome of

18   this matter.

19        IN WITNESS WHEREOF, I have hereunto

20   set my hand this 18th day of March 2025.

21

22

23        _____
               MARINA DUBSON
24

25
```

